*Juvenal Goicochea v. Rosa Goicochea*, No. 0877, September Term 2020, Opinion by Moylan, J.

**HEADNOTES:**

THE CONTENTIONS – BACKGROUND – I. HUSBAND'S DISSIPATION OF MARITAL FUNDS – A. CASH WITHDRAWALS – B. EXPENDITURES ON THE TERN DRIVE PROPERTY – C. $79,050 OF PAYMENTS TO HUSBAND'S PARAMOUR AND HER FAMILY; $61,765 FOR HUSBAND'S PARAMOUR'S GIFTS, EXPENSES, TRAVEL, AND DINING – D. HUSBAND'S RELIANCE ON SMITH V. SMITH, 18 VA. APP. 427 (1994) IS UNAVAILING – II. WIFE'S ALLEGED DISSIPATION OF FUNDS IN THE PARTIES' HOME EQUITY LINE OF CREDIT – III. THE VALUATION OF THE HUSBAND'S MINORITY INTEREST IN MASC – IV. THE NON-MARITAL PORTION OF FUNDS IN WIFE'S UBS ACCOUNT – V. THE COURT'S ALIMONY DETERMINATION

Circuit Court for Montgomery County
Case No. 157200FL

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 877

September Term, 2020

---

JUVENAL GOICOCHEA

v.

ROSA GOICOCHEA

---

Graeff,
Shaw,
Moylan, Charles E., Jr.
   (Senior Judge, Specially Assigned),

JJ.

---

Opinion by Moylan, J.

---

Filed: December 6, 2022

*Tang, J., and Albright, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

This matter stems from a divorce proceeding in the Circuit Court for Montgomery County. In November 2018, the appellee, Rosa Goicochea ("Wife"), filed a Complaint for Absolute Divorce, or, alternatively, Limited Divorce, Alimony, and for Other Appropriate Relief. In October 2019, the appellant, Juvenal Goicochea ("Husband"), filed a Counterclaim for Absolute Divorce. After a trial in March 2020, the court entered a judgment of absolute divorce, granting Wife indefinite alimony in the amount of $7,155 per month and a monetary award in the amount of $667,750.[1] Husband timely appeals.

## The Contentions

Husband presents the following questions[2] for our review, which we have rephrased and reformatted as follows:

---

[1] The judgment of absolute divorce also included the following conditions. As requested by the parties, the court ordered an equalization of their retirement assets. To accomplish that equalization, the court ordered Husband to transfer $644,365 from his profit-sharing plan. The court ordered a sale of the former marital home and an equal division of the net proceeds from that sale. The court denied Wife's request for attorney's fees.

[2] Husband phrased his questions presented as follows:

1. Did the trial court err by finding the appellant had dissipated marital funds?

2. Did the court err by finding the appellee had not dissipated the entire $200,000.00 she removed from the parties' home equity line of credit without appellant's knowledge or consent and deposited in her secret bank accounts?

3. Did the court err in valuing appellant's minority interest in Massachu[s]etts Avenue Surgery Center based on the price paid for a majority interest?

**1. Did the court err in finding that Husband had dissipated marital funds?**

**2. Did the court err in finding that Wife had not dissipated $200,000 from the parties' home equity line of credit?**

---

4. Did the court err by finding that the appellee's reasonable needs were $15,623.81 per month when her testimony contradicted the trial court's findings regarding her expenses?

Husband also presented two additional questions, which the parties agree are now moot:

5. Did the trial court err by denying appellant's motion to reopen the record because the appellant's surgical practice income had plummeted as a result of COVID?

6. Did the court err by granting appellee's motion to alter [or] amend filed <u>after</u> the appellant filed his notice of appeal and entered an amended judgment of divorce?

During oral argument before this Court, both parties' attorneys agreed on the mootness of Husband's fifth and sixth questions presented. As to Husband's fifth question presented, Wife's counsel stated that the Husband had filed a motion to modify alimony almost simultaneously with his notice of appeal. Wife's counsel then said that the issue "was withdrawn recently, and the matter was resolved, and alimony of the amount that the appellant had not been paying as alimony as directed by the court was rectified, so I believe that that issue as far as how COVID impacted the appellant's income" is moot.

As to Husband's sixth question presented, Wife's counsel stated during oral argument: "the parties conceded that the court erred in entering two judgments for the same exact monetary award, that matter has been rectified, and that was the significant point made by the appellant regarding the motion to alter or amend, so I believe that issue is essentially moot at this point."

This Court then asked Husband's counsel to address Wife's counsel's argument about the mootness of the fifth and sixth questions presented, and Husband's counsel conceded: "That is correct. Your Honor, that is correct." Husband's counsel did not otherwise argue against mootness, and thus Husband's counsel agreed that the fifth and sixth questions presented are moot. As a result, our opinion does not decide those questions. See Bond v. Slavin, 157 Md. App. 340, 353-54 (2004) ("[a]ppellate courts generally do not decide academic or moot questions.").

2

**3. Did the court err in valuating Husband's interest in the Massachusetts Avenue Surgery Center ("MASC")?**

**4. Did the court err in ruling that Wife's UBS account x9816 contained non-marital funds?**

**5. Did the court's alimony award amount to an error?**

## BACKGROUND

Wife and Husband met while they were attending medical school in Trujillo, Peru. They married each other in July 1974. Their daughter was born in Peru, and they moved to the United States in 1977 for Husband's residency, when their daughter was two-and-a-half years old. The parties' son was born six years after their daughter was born. At the time of the trial, the parties' daughter was 44 years old, and their son was 38 years old.

The parties' daughter testified about the parents' roles in the household during her adolescence:

> So, my father was the primary breadwinner, or the sole breadwinner. He had his practice and he was very busy. So, when we first moved to the States, he was a resident of the Washington Hospital Center. So, he had those weird resident hours, 24 on/24 off, and my mom was 100 percent responsible for taking care of me, cooking and cleaning, things that she had never done before when we were in Peru, things that she had to learn here.
>
> And then when my brother was born, she continued to be, like, the sole caretaker during that time. It was only, I think around when I was eight or nine, I believe my parents hired someone, a live-in, who was a housekeeper/nanny.

Husband opened a solo surgical practice in 1982, and he maintained his surgical practice at the time of the trial. Wife began working for the practice in 1989, and she completed billing work for the practice.

3

Husband began an adulterous relationship with his first paramour by 2006, and he moved out of the marital home until 2008. Husband returned home in 2008 after he promised Wife that he would cease contacting his paramour. Husband broke that promise, and he continued financially supporting his paramour through December 2016.

Around December 2016, Husband admitted to Wife that he was having an adulterous relationship with his second paramour. Husband rented an apartment for his second paramour and contributed money towards her rent. Husband bought a home in October 2017 on Tern Drive in Potomac, where he and his second paramour resided together.

The court ultimately found that Husband had dissipated $609,111 of marital funds through large bank account withdrawals, his payments towards the Tern Drive property, and his payments to his paramours, which included gifts, travel, and dining expenses. The court granted Wife an absolute divorce based upon Husband's adultery.

After Wife learned of Husband's adultery in 2006, and after Husband restricted her access to funds, Wife withdrew $200,000 from the parties' home equity line of credit ("HELOC"). At trial, Wife could not explain the use of $50,000 of those funds, and she thus conceded that she had dissipated that $50,000. As to the remaining $150,000 withdrawn from the HELOC, the court found as follows: "Wife presented credible evidence to show that all but approximately $50,000 of the funds were used for marital or family expenses."

At the time of the trial, Husband was 71 years old, and Wife was 70 years old. We will supply additional facts as needed in the discussion of the questions presented.

4

# I. HUSBAND'S DISSIPATION OF MARITAL FUNDS

Husband first claims that the court erred in determining that he had dissipated marital funds. Wife responds that the court correctly applied Maryland law and found that Husband had dissipated $609,111 in marital assets based on the following evidence presented at trial: Husband's large bank account withdrawals; his payments towards the Tern Drive property; and his payments to his paramours, which included gifts, travel, and dining expenses.

Dissipation occurs when one party "spen[ds] or otherwise deplete[s] marital funds or property with the principal purpose of reducing the amount of funds that would be available for equitable distribution at the time of the divorce." Omayaka v. Omayaka, 417 Md. 643, 653 (2011) (quoting Welsh v. Welsh, 135 Md. App. 29, 51 (2000)). When dissipation of marital assets is found, it constitutes "no more than a fraud on marital rights" and the dissipated assets should be considered "extant marital property . . . to be valued with the other existing marital property." Sharp v. Sharp, 58 Md. App. 386, 399 (1984). "A trial court's judgment regarding dissipation is a factual one and, therefore, is reviewed under a clearly erroneous standard." Omayaka, 417 Md. at 652. "If there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous." Omayaka, 417 Md. App. at 652-53 (quoting Fuge v. Fuge, 146 Md. App. 142, 180 (2002)). Further, Md. Rule 8-131(c) states that when an action is tried without a jury, the appellate court reviews the case based on the law and the evidence and will "give due regard to the opportunity of the trial court to judge the credibility of the witnesses." As such, a trial court is granted significant deference and is entitled to "accept—or reject—all,

5

part, or none of the testimony of any witness." Omayaka, 417 Md. at 659. But to the extent that "the order being reviewed involves an interpretation or application of Maryland statutory or case law, our review is *de novo*." Evans v. Wilson, 382 Md. 614, 623 (2004).

The Court of Appeals has explained the burden of proof[3] for a dissipation claim as follows:

---

[3] In Omayaka, the Court of Appeals examined the "cookbook method" promulgated in Fader & Gilbert's *Maryland Family Law*. "As modified to clarify the burdens of production and persuasion," the Court of Appeals stated, "that method is as follows:

• If property does not exist at the time of divorce, it cannot usually be included as marital property.

• Well, that is so unless one spouse proves [by a preponderance of the evidence] that the other spouse dissipated assets acquired during the marriage to avoid inclusion of those assets toward consideration of a monetary award.

• [A prima facie case] of dissipation occurs when evidence is produced that marital assets were taken by one spouse without agreement by the other spouse.

• Then, the burden of going forward with evidence shifts to the party who [allegedly] took the assets without permission to [produce evidence that generates a genuine question of fact on the issue of (1) whether the assets were taken without agreement, and/or (2)] where the funds are [and/or (3) whether the funds] were used for marital or family expenses.

• If that proof of use for marital or family purposes is not produced, then the property taken is 'extant' marital property, titled in or owned by the individual who took the marital property without permission.

• From that 'extant' property in the name of one spouse, the other spouse may be given a monetary award to make things equitable."

Omayaka, 417 Md. at 655-56 (citing John F. Fader, II & Richard J. Gilbert, Maryland Family Law, § 15-10 (4th ed. 2006)).

6

The burden of persuasion and the initial burden of production in showing dissipation is on the party making the allegation. That party retains throughout the burden of persuading the court that funds have been dissipated, but after that party establishes a prima facie case that monies have been dissipated, i.e. expended for the principal purpose of reducing the funds available for equitable distribution, the burden shifts to the party who spent the money to produce evidence sufficient to show that the expenditures were appropriate.

Omayaka, 417 Md. at 656-57 (quoting Jeffcoat v. Jeffcoat, 102 Md. App. 301, 311) (internal citation omitted)). In addition, "[p]roof that a spouse made sizable withdrawals from bank accounts under his or her control is sufficient to support the finding that the spouse had dissipated the withdrawn funds." Omayaka, 417 Md. at 657.

## A. Cash withdrawals.

Husband argues that the court erred in finding that Wife proved that Husband had dissipated $268,300 in cash withdrawals. The court found that Husband dissipated $268,300 through numerous large cash withdrawals from July 2015 through February 2020. During that time, Husband withdrew a total of $318,300 in cash from bank accounts.

At trial, Wife presented expert testimony from Joseph Estabrook. The court admitted Estabrook as an expert in business valuation, forensic accounting, asset tracing and use of funds, and income tax issues. Estabrook's summary, which was admitted at trial, detailed Husband's large cash withdrawals from 2015 through February 2019. Those withdrawals amounted to $276,300. After Estabrook completed his summary, Wife received additional documents, which showed that Husband withdrew approximately $42,000 in cash from March 2019 through February 2020. As a result, the trial court found that Husband had withdrawn a total of $318,300. Based on that finding, the court found

7

"that Wife made out a *prima facie* case of dissipation[,]" and "Wife effectively shifted the burden to Husband to show that his cash withdrawals were appropriate." The court then thoroughly examined Husband's testimony and made credibility findings. The court determined that Husband's testimony established that he did not dissipate $50,000 that he withdrew for attorney's fees, but he dissipated the remaining $268,300 of cash.

First, the court examined Husband's testimony that he wrote himself a $76,990.54 check to pay 2017 federal taxes. Husband presented no documentary evidence of that alleged payment to the IRS, and the court found that Husband's testimony was not credible:

> Husband testified that on February 2, 2018, he wrote himself a $76,990.54 check to pay 2017 federal taxes. He could not recall whether this was for taxes due on a joint return. The bank records belie his testimony. On February 2, 2018, Husband withdrew from BB&T Checking Account x9796 cash in the amount of $76,990.54.[] On that day, he redeposited $26,990.54 into BB&T Money Market Account x8429.[] On that day, he also withdrew $50,000 from Eagle Bank Checking Account x1087 in the form of five $10,000 cashier's checks.[] Documentary evidence of a $76,990.54 payment to the IRS, such as a canceled check or bank or credit card statement, was not presented. The Court does not find credible Husband's testimony about the alleged $76,990.54 IRS payment for 2017 federal taxes.

Second, the court determined that Husband's evidence established that a $50,000 withdrawal was appropriate:

> Husband also testified that he initially received $380,000 for the sale of a portion of his interest in MASC. He testified that he deposited these sale proceeds into a BB&T account. No documentary evidence was presented to confirm the $380,000 purported deposit. However, on November 6, 2018, Husband withdrew $380,000 from BB&T Money Market Account x8429.[] BB&T issued Husband six $50,000 cashier's checks and five $10,000 cashier's checks, for a total of $350,000.[] On February 11, 2019, Husband deposited $350,000 into BB&T Money Market Account x8984.[] On the following day, Husband wrote Check #105 from this account for $50,000.[]

8

Husband explained that he used the $380,000 cash from this November 6, 2018 withdrawal for payment of (1) $50,000 for attorney's fees, (2) an unspecified amount for federal and state taxes, and (3) an unspecified amount for personal expenses. Proof of the $50,000 attorney's fees payment would have been relatively simple, through production of a copy of the check. Although Husband failed to produce a check, his counsel's March 3, 2019 Invoice includes a February 11, 2019 entry for a $50,000 deposit from Husband into counsel's trust account.[] The Court finds that Husband's evidence satisfied his burden of proof with respect to this $50,000. The Court further finds that Wife has not met her ultimate burden of persuasion regarding the alleged dissipation of this $50,000. . . .

Over more than 4½ years, from July 9, 2015 to February 11, 2020, Husband withdrew from bank accounts cash totaling $318,300. The Court does not find credible Husband's testimony regarding the use of all but $50,000 of the cash he had withdrawn in November 2018. The Court finds that Husband dissipated $268,300 ($318,300 - $50,000 = $268,300) in cash, which is extant marital property, titled in or owned by Husband.

On appeal, Husband claims that the circuit court "based its finding that [Husband] had dissipated $318,000.00 in large cash withdrawals on the **assumption** that if [Husband] could not explain every large cash withdrawal, he had made in the last 54 months, he must have spent the money on a paramour." But the court did not base its conclusions on Husband's failure to explain "every large cash withdrawal" that "he had made in the last 54 months[.]" Instead, the court made detailed credibility findings about Husband's attempts to explain his cash withdrawals:

No documentary evidence supported Husband's testimony regarding his alleged payments of unspecified amounts for federal and state taxes. The Court finds that proof of the federal and state tax[] payments would have been uncomplicated. It was unexplained and is therefore unclear why Husband would have been paying additional federal and state taxes in November 2018 when, according to him, he paid the IRS $76,990.54 in February 2018 for 2017 federal taxes. The Court does not find credible Husband's testimony regarding his use of a portion of the cash he had withdrawn in November 2018 to pay federal and state taxes. The Court finds that Husband failed to adduce evidence sufficient to satisfy his burden of

9

proof with respect to his alleged payments of unspecified amounts for federal and state taxes.

No documentary evidence supported Husband's testimony regarding his alleged payments of unspecified amounts for personal expenses. Husband claimed that as of February 21, 2020, his total monthly expenses and income were $11,186.89 and $16,012.26, respectively, leaving him with a $4,825.57 monthly surplus.[] The Court finds incredible Husband's claim that he paid personal expenses with the cash from [the $380,000] November 6, 2018 withdrawal because he has a $4,825.57 monthly surplus with which he can pay his alleged personal expenses. The dubious nature of Husband's claim is magnified when one considers his history of large expenditures for developing and maintaining his extramarital affairs. The Court finds that Husband failed to adduce evidence sufficient to satisfy his burden of proof with respect to his alleged payments of unspecified amounts for personal expenses.

The record contains competent, material evidence that supports the circuit court's finding that Husband had dissipated $268,300 in cash withdrawals, and thus we cannot say that finding is clearly erroneous. See, e.g., Figgins v. Cochrane, 403 Md. 392, 409 (2008). In addition, the court's credibility determinations underpin its rulings on Husband's cash withdrawals, and "we will not find clear error in a ruling based on a credibility determination." Collins v. Collins, 144 Md. App. 395, 413 (2002).

**B.     Expenditures on the Tern Drive property.**

Next, Husband contends that the court erred in determining that he had dissipated $199,996 in expenditures on the Tern Drive property. According to Husband, "the Court's reason for including the expenses for [the] Tern Drive [property] in the monetary award is not supported by the case law; there is no 'paramour' double standard rule of dissipation."

Wife responds that Husband's "use of marital assets for these types of expenses without the agreement of [Wife] is dissipation."

Wife was unaware of Husband's purchase of the Tern Drive property until she received an email from the parties' insurance agent to verify insurance information for the new home. Husband's paramour resided in the Tern Drive property. When Wife's counsel asked Husband if the Tern Drive property was Husband's paramour's address, Husband responded: "I believe she listed it as her address." The court made the following findings as to Husband's dissipation of expenditures on the Tern Drive property:

> Husband purchased the Tern Drive Property in 2018 for $565,000, and the Parties agree that its current fair market value is $565,000. The Parties agree, and the Court therefore finds, that the Tern Drive Property has not appreciated in value since its purchase. The property is titled in Husband's sole name, and only Husband is on the mortgage. As previously discussed, the Parties agree, and the Court so finds, that the Tern Drive Property is marital property titled in Husband's sole name.

> Wife adduced evidence showing that Husband expended $199,996 for the Tern Drive Property.[] Wife credibly testified that these expenditures were made without her agreement. With this evidence, Wife made a *prima facie* case of dissipation. . . .

> The dispute centers on whether these expenditures were for marital or family expenses. . . .

> The fallacy in Husband's argument is that it assumes that both Parties benefitted from Husband's Tern Drive Property purchase and subsequent expenditures. Over a period of some two years, Husband dumped nearly $200,000 of marital assets into the Tern Drive Property. Those marital assets are gone, and the Tern Drive Property's value remains unchanged. The only beneficiaries of those expenditures are Husband and his paramour. In no way can it seriously be said that Husband's Tern Drive Property expenditures were used for marital or family expenses.

11

We find no error in the trial court's comprehensive analysis. Dissipation occurs when "marital assets were taken by one spouse without agreement by the other spouse." Omayaka, 417 Md. at 652 (quoting John F. Fader, II & Richard J. Gilbert, Maryland Family Law, § 15–10 (4th ed. 2006)). The court determined that Wife credibly testified that she did not agree to Husband's payments towards the Tern Drive property, where Husband's paramour resided.

Referring to the existence of the Tern Drive property, Husband argues "that dissipation cannot occur if the piece of allegedly dissipated property still exists." The trial court addressed this contention in its opinion and cogently noted that this argument misses the mark because the funds that Husband expended on the Tern Drive property no longer exist, and those expenditures did not increase the fair market value of the Tern Drive property.

The record contains competent evidence to support the court's finding that Husband dissipated $199,996 for the Tern Drive property. That finding is not clearly erroneous. Omayaka, 417 Md. App. at 652-53.

## C. $79,050 of payments to Husband's paramour and her family; $61,765 for Husband's paramours' gifts, expenses, travel, and dining.

Husband contends that the court erred in determining that he had dissipated funds related to his paramours. The court found as follows:

> Wife adduced credible, uncontradicted evidence that from September 11, 2006 through December 27, 2016, a period of more than 10 years, Husband transferred $79,050 to his paramour and her family. Wife did not agree to Husband's payments to his paramour. With this evidence, Wife made a *prima facie* case of dissipation. . . .

12

Husband's only response is that these payments are not dissipation because the Parties were not going through an irreconcilable breakdown at the time that he gave $79,050 to his paramour and her family. . . .

The parties reconciled and remained together as a married couple in 2008 because of Husband's false promise to discontinue his relationship with his paramour. Wife remained in the marriage conditioned upon Husband's terminating his extramarital relationship. Husband broke his promise and continued financially supporting his paramour through December 2016, shortly before beginning his next adulterous relationship.

The record in this case clearly shows that Husband was able to remain in the marriage by convincing Wife that he had ended the extramarital relationship with his paramour. Through deception, he was able to expend marital funds to continue his relationship with his paramour. The reason that the Parties were not going through an irreconcilable breakdown at the time that Husband gave $79,050 to his paramour and her family is that Husband lied to and deceived Wife. A court adjudicating issues pertaining to divorce sits in equity. MD. CODE, FAMILY LAW § 1-201(b)(4). It would be inequitable for Husband to profit from his cheating and deception.

*  *  *

Wife adduced credible evidence that from August 12, 2006 through December 26, 2018, a period of more than 12 years, Husband expended $61,765 for gifts to, expenses paid on behalf of, and travel and dining with his paramours.[] Wife did not agree to Husband's expenditures for his paramours. With this evidence, Wife made a *prima facie* case of dissipation. . . .

The Court does not find credible Husband's limited efforts to explain that certain of these expenditures were not for a paramour but rather were for him personally.

On appeal, Husband claims that the court erroneously relied on Estabrook's summary of Husband's transactions pertaining to his paramours: payments to paramours and paramours' families, as well as gifts, expenses paid, travel and dining with paramours. We disagree. The evidence at trial, which included Estabrook's summary, provided competent evidence that supports the court's findings.

13

First, the record supports the court's finding that Husband dissipated $79,050 in payments to his first paramour and her family. Husband wired $35,000 to that paramour in September 2006. Portions of that paramour's deposition testimony were read into the record at trial. She testified that she and Husband were engaged and that he had given her a diamond ring. Husband and Wife reconciled in 2008. But Wife learned during the discovery process of this case that Husband had been writing checks to that paramour and her family from 2012 through December 2016. The total amount that he paid to his paramour and her family during that time was $44,050.

Second, the record supports the court's finding that Husband's purchases of gifts for his paramours, expenses paid for his paramours, travel with paramours, and dining with paramours totaled $61,765 of dissipation. Schedules E, F, G, and H of Estabrook's summary detailed these expenditures. The court noted that the "deposition testimony of Husband's two paramours, which was received in evidence, corroborated many of the expenses identified in Schedules E, F, G, and H." Moreover, Husband rented an apartment with his second paramour in October 2016, he had a joint credit card with that paramour beginning in March 2017, and he traveled with both paramours.

Husband contends that "for paramour gifts, [Wife] and/or Mr. Estabrook **assumed** charges were for a paramour and based on that **assumption,** Mr. Estabrook listed the charges as being for a paramour. Dissipation requires more the mere assumption to shift the burden of proof." Husband's contention, however, conflicts with the deference that we apply to a circuit court's credibility finding: "In its assessment of the credibility of witnesses, the Circuit Court was entitled to accept—or reject—*all, part, or none* of the

14

testimony of any witness, whether that testimony was or was not contradicted or corroborated by any other evidence." Omayaka, 417 Md. at 659. As to the $61,765 in Husband's paramours' gifts, expenses, travel, and dining, the court ruled as follows: "The Court does not find credible Husband's limited efforts to explain that certain of these expenditures were not for a paramour but rather were for him personally." Indeed, the court expressly found that Husband "lie[d]" at several points throughout his testimony. Conversely, the court found that "Wife adduced credible evidence that . . . Husband expended $61,765 for gifts to, expenses paid on behalf of, and travel and dining with his paramours." We find no error in the court's credibility determinations, and the record contains competent evidence that supports the court's findings.

**D.     Husband's reliance on Smith v. Smith, 18 Va. App. 427 (1994) is unavailing.**

At oral argument, Husband's counsel urged us to examine Smith v. Smith, 18 Va. App. 427 (1994), in which the Court of Appeals of Virginia declined to "expand the definition [of dissipation] to cover expenditures made for a fifteen-year period which were not specifically for the purpose of depleting the marital estate and where there was no evidence that there was an irreconcilable breakdown of the marriage." Id. at 431. According to Husband, Wife "failed to meet her burden because she failed to show those expenditures were made during a time when the marriage was going through an irreconcilable breakdown or were to avoid inclusion in a monetary award." We are unpersuaded by Husband's reliance on Smith.

The husband in Smith "admitted to a fifteen-year extramarital affair with a woman, whom he saw at least once a year in a variety of locations, sometimes on business trips for

15

which he was partially reimbursed." Id. at 429. The appellate court concluded that the evidence was insufficient to justify an award based on the husband's use of marital funds in pursuit of his extended extramarital affair: "Although husband admitted that his paramour accompanied him periodically on trips, he testified that some of these were reimbursed business trips." By contrast, the court here found that the Husband expended $199,996 on a property where his paramour resided, spent $79,050 in payments to his paramour and her family, and spent $61,765 on his paramours' gifts, expenses, travel, and dining.

At any rate, under Maryland law, Husband's actions amounted to dissipation. In Omayaka, the Court of Appeals stated that "dissipation may occur on occasions in which (1) the marriage is not undergoing an irreconcilable breakdown, and/or (2) the dissipating spouse's *principal purpose* was a purpose other than the purpose 'of reducing the amount of funds that would be available for equitable distribution at the time of the divorce.'" Omayaka, 417 Md. at 652 (quoting Welsh v. Welsh, 135 Md. App. 29, 51 (2000) (footnote omitted). Dissipation happens when "marital assets were taken by one spouse without agreement by the other spouse." Id. at 652. For this reason, we focus our analysis on the purpose of the alleged dissipator: "what is critically important is the purpose behind the expenditure. The doctrine of dissipation is aimed at the nefarious purpose of one spouse's spending for his or her own personal advantage so as to compromise the other spouse in terms of the ultimate distribution of marital assets." Heger v. Heger, 184 Md. App. 83, 96 (2009).

16

For all the reasons stated above, the court applied the correct law and made conclusions that are supported by substantial evidence in the record. The court did not err in determining that Husband had dissipated $609,111 in marital funds.

## II. WIFE'S ALLEGED DISSIPATION OF FUNDS IN THE PARTIES' HOME EQUITY LINE OF CREDIT

Husband next argues that the court erred in determining that Wife had not dissipated $200,000 from the parties' HELOC. It is undisputed that Wife withdrew $200,000 from the parties' HELOC in November 2006. Wife testified that she withdrew those funds after Husband restricted her access to funds: "Because [Husband] cut all my credit cards, he cut my signatory authority in the business account. So, I was worried about my financial situation." At trial, Wife could not explain the use of $50,000 of those funds, and she thus conceded that she had dissipated that $50,000. The court found that Wife dissipated $50,000 of the $200,000 withdrawal and that she presented credible evidence that the remaining $150,000 were used for marital or family expenses:

> [Wife] testified that she withdrew these funds because she was worried about her financial condition since Husband had "cut" all her credit cards and her signatory authority in the business account. She testified that she used some of these funds to pay towards the HELOC. She also testified that, through December 2016, these funds still existed in her Capital One Savings account[,] UBS account[,] and Citibank accounts . . . . Thereafter, Wife testified, she used all except approximately $50,000 of these funds to pay counsel fees and expenses in 2017 and 2018.

> A *prima facie* case of dissipation having been established, the burden is on Wife to show the appropriateness of her expenditures. Wife claims that all but approximately $50,000 of the funds were used for marital or family expenses. She testified that after learning of Husband's extramarital relationship, on November 6, 2006, she withdrew $200,000 from the parties' HELOC.[] Those funds were deposited into a new M&T Bank account in Wife's sole name.[] On February 6, 2007, $100,000 was transferred to an

17

ING account in Wife's sole name.[] The remaining approximately $100,350 was deposited into Wife's Citibank checking and savings accounts.[] Wife also had a PNC account into which she was depositing her approximately $1,800 monthly paychecks.[]

From the funds in her ING/Capital One account, Wife in April 2008 opened and deposited $20,000 into a new UBS account.[] She also transferred funds from her ING/Capital One account into her PNC Bank account . . . to make monthly payments towards the HELOC.[] From November 2006 through January 2014, Wife made $1,000 monthly payments towards the HELOC.[] On March 14, 2014, the parties' investment property located on Beech Drive sold, resulting in sales of proceeds of $223,332.06. Wife attributed ½ of the proceeds to her HELOC and ½ to the existing HELOC.[] Wife also equally applied the Parties' Virginia condo rental income to her HELOC and the existing HELOC. . . .[]

Wife cannot account for and concedes that she has dissipated . . . $50,000.

Wife presented credible evidence to show that all but approximately $50,000 of the funds were used for marital or family expenses. The Court therefore finds that Wife dissipated $50,000 of [marital] assets, which is extant marital property, titled in or owned by Wife.

Husband claims that the court erred because, according to Husband, Wife dissipated all $200,000 in marital assets that she withdrew from the parties' HELOC. We disagree. The court found that "Wife demonstrated (1) where the $200,000 was deposited, (2) that the vast majority of the funds remained in the same accounts through 2016, and (3) how she used the funds withdrawn from the HELOC, including repaying the $78,174.76 to the HELOC from the funds she withdrew (or from her income)." As we noted in Bricker v. Warch, 152 Md. App. 119, 137 (2002), and as the Court of Appeals reiterated in Omayaka, "it is . . . almost impossible for a judge to be clearly erroneous when he [or she] is simply **NOT PERSUADED** of something." 417 Md. at 658-59. The trial court was simply not persuaded that Wife had dissipated all $200,000 that she withdrew from the parties'

HELOC. And competent evidence supports the trial court's ruling. The court did not err in determining that Wife dissipated $50,000 of the $200,00 withdrawal.

## III. THE VALUATION OF THE HUSBAND'S MINORITY INTEREST IN MASC

Husband argues that the court erred in valuating his minority interest in MASC. According to Husband, the court's valuation amounts to an error because it was based on a premium that a buyer paid for a controlling interest. The parties presented dueling expert testimony as to the valuation of Husband's interest in MASC. The court determined that Wife's expert's valuation was more persuasive:

> Relying primarily upon Mr. Estabrook's expert opinions, Wife contends that MASC's value is $332,000.[] Relying primarily upon Mr. White's expert opinions, Husband contends that MASC's value is $41,000.[]

> Mr. Estabrook[] reached his value opinion using Husband's April 1, 2018 sale of a 1.1125% interest in MASC for $444,991, implying a $39,999,000 fair market value for MASC. Husband's remaining 0.829301% interest would therefore have a fair market value of $332,000. []

> Mr. White criticized Mr. Estabrook's methodology. He contends that no third-party would purchase a minority interest in MASC. He also asserted that nobody would pay $332,000 for a $20,000 annual return. Using the 2018 K-1, Mr. White tried to extrapolate what the income would be based upon the ending ownership percentage for each year, averaged them together, and divided by 3, resulting in a $20,000 value, rounded. Mr. White subsequently received an email that caused him to "slightly" increase his value opinion to "about" $45,000.[]

> Neither expert had available to him the documents necessary to perform the type of valuation analysis that they had performed for the practice. Utilizing an income approach, Mr. White determined MASC's value based upon the income that Husband received from his MASC interest over a three-year period. However, he completely abandoned that approach based upon an email provided [to] him and increased his valuation by 125%. Mr. Estabrook based his MASC valuation upon an actual purchase of an interest in MASC. The Court finds Mr. Estabrook's analysis more persuasive and finds that MASC's value is $332,000.

Maryland courts recognize that "[v]aluation is not an exact science." Innerbichler v. Innerbichler, 132 Md. App. 207, 241 (2000) (citing Brodak v. Brodak, 294 Md. 10, 27 (1982)). Because "business valuation is far more complex" than the valuation of most types of assets, courts usually require expert testimony to determine the value of a business. Long v. Long, 129 Md. App. 554, 570 (2000). Nevertheless, "the trial judge need not accept the testimony of any expert." Quinn v. Quinn, 83 Md. App. 460, 470 (1990). An expert's opinion has "'no greater probative value than the soundness of [the] reasons given'" for the opinion. Skrabak v. Skrabak, 108 Md. App. 633, 648 (1996) (quoting Beatty v. Trailmaster Prods., Inc., 330 Md. 726, 741 (1992)) (citations and quotation marks omitted). Where "there are two experts, the trier of fact must evaluate the testimony of both of them and decide which opinion, if any, to accept." Long, 129 Md. App. at 570 (quoting Quinn, 83 Md. App. at 470).

Husband cites no case holding that the trial court was required to credit his expert's opinion over Wife's expert's opinion. As the court noted, Estabrook's valuation was based on the facts available to him based on a recent sale of another portion of Husband's interest in MASC. Generally, this Court will uphold a decision to credit an opinion on valuation where the opinion is "explained in detail" and not "totally devoid of reason or logic." Fox v. Fox, 85 Md. App. 448, 459 (1991). The court's decision was reasonable, logical, and explained in detail. Although another fact-finder might have accepted Husband's expert's opinion over Estabrook's opinion, the trial court was not clearly erroneous when it accepted Estabrook's opinion testimony as to the value of Husband's interest in MASC.

## IV. THE NON-MARITAL PORTION OF FUNDS IN WIFE'S UBS ACCOUNT

Under the same heading pertaining to his challenge to the court's ruling on the valuation of his interest in MASC, Husband presents a seemingly unconnected and discrete issue in his brief filed in this Court: Husband challenges the trial court's ruling that Wife's UBS x9816 account contained both marital and non-marital portions. Husband's counsel did not raise this issue within his questions presented. *Cf.* Md. Rule 8-504(a)(3) (requiring a party's brief to contain "[a] statement of the questions presented, separately numbered, indicating the legal propositions involved and the questions of fact at issue expressed in the terms and circumstances of the case without unnecessary detail."). Nevertheless, we shall address this issue.

The court found that the value of this UBS account was $137,493. Wife's mother died in 2012, and as the court found, "Wife received an inheritance from her mother's estate. From that inheritance, on October 26, 2012, Wife deposited $47,045.60 into" this UBS account. The court's opinion stated as follows:

> No other funds were deposited into that account after that date, and no funds have ever been withdrawn from that account. Wife took no steps to actively manage the account. Wife contends that the marital and non-marital portions are 30% and 70% respectively ($47,045.60 ÷ $67,447.63 = 0.6975, or 70% rounded). Wife asserts that this account's marital and non-marital portions are therefore $41,248 (137,493.47 x 30%) and $96,245 ($137,493.47 x 70%), respectively.

The court found that Wife's testimony regarding her inheritance was credible, and thus "this account's marital and non-marital portions are $41,248 ($137,493.47 x 30%) and $96,245 ($137,493.47 x 70%), respectively."

Husband argues as follows: "Given the fact that the Appellee historically withdrew large amounts of cash and kept all her salary, it is more likely that the $47,000 deposit Appellee claims was her inheritance, was in fact funds she accumulated during the Parties' marriage, it may even be part of the $200,000.00 she took from the HELOC." The court noted that Husband presented no evidence to support this same argument at trial: "He offered no evidence on this issue, merely testifying that he assumed that Wife received an inheritance and she never told him the amount of the inheritance or what she did with the inheritance." Indeed, Husband's argument is based on a supposition, rather than the evidence presented at trial.

Husband also argues that these funds were commingled, and thus, according to Husband, all the funds in this UBS account were marital. But Wife was able to directly trace a portion of the funds to a non-marital source: her inheritance. And as the court noted, "Wife's testimony regarding her inheritance was unrebutted" and "credible[.]" We find no error in the court's ruling.

## V. THE COURT'S ALIMONY DETERMINATION

Husband contends that the court erroneously determined that Wife's necessary reasonable expenses were $15,623.81 per month. Husband claims that the court thus erred in awarding Wife indefinite alimony in the amount of $7,155 monthly.

"[W]e may disturb an award of alimony if we conclude that . . . 'the trial court abused its discretion or rendered a judgment that is clearly wrong.'" Brewer v. Brewer, 156 Md. App. 77, 98 (2004) (quoting Innerbichler, 132 Md. App. at 246). We "accord great deference to the findings and judgments of trial judges, sitting in their equitable

22

capacity, when conducting divorce proceedings." Tracey v. Tracey, 328 Md. 380, 385 (1992). We will disturb a trial court's ruling only when "no reasonable person would take the view adopted by the trial court," or when "the ruling is clearly against the logic and effect of facts and inferences before the court[.]" Reynolds v. Reynolds, 216 Md. App. 205, 219 (2014) (quotation marks, brackets, and citations omitted).

"[A]limony awards, though authorized by statute, are founded upon notions of equity[.]" Tracey, 328 Md. at 393. "Because the purpose of alimony is the 'rehabilitation of the economically dependent spouse,' Maryland favors the provision of rehabilitative alimony for a fixed term to assist the dependent spouse in becoming self-supporting." Kaplan v. Kaplan, 248 Md. App. 358, 371 (2020) (quoting St. Cyr v. St. Cyr, 228 Md. App. 163, 184 (2016)). Still, indefinite alimony is appropriate when fairness requires it. Boemio v. Boemio, 414 Md. 118, 143-44 (2010). Indefinite alimony should be reserved, however, for exceptional circumstances: "if the standard of living of one spouse will be so inferior, qualitatively or quantitatively, to the standard of living of the other as to be morally unacceptable and shocking to the court." Karmand v. Karmand, 145 Md. App. 317, 338 (2002).

When deciding whether and how to award alimony, the court must consider these factors:

> (1) the ability of the party seeking alimony to be wholly or partly self-supporting;
>
> (2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;
>
> (3) the standard of living that the parties established during their marriage;

23

(4) the duration of the marriage;

(5) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties;

(11) the financial needs and financial resources of each party, including:

> (i) all income and assets, including property that does not produce income;

> (ii) any award made under §§ 8-205 and 8-208 of this article;

> (iii) the nature and amount of the financial obligations of each party; and

> (iv) the right of each party to receive retirement benefits; and

(12) whether the award would cause a spouse who is a resident of a related institution as defined in § 19-301 of the Health-General Article and from whom alimony is sought to become eligible for medical assistance earlier than would otherwise occur.

Md. Code, Family Law ("FL") § 11-106(b).  Although no formal checklist is required, the trial court must demonstrate that it has considered all necessary factors.  Simonds v. Simonds, 165 Md. App. 591, 604-05 (2005) (citing Roginsky v. Blake-Roginsky, 129 Md. App. 132, 143 (1999)).

24

After considering the factors in subsection (b), a court may award indefinite alimony in exceptional cases if it makes the following finding:

(1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

(2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

FL § 11-106(c). "In cases involving dramatic income disparities after long marriages, this Court has found an abuse of discretion in a trial court's failure to award indefinite alimony." St. Cyr, 228 Md. App. at 196. Here, the court found that "even after Wife will have made as much progress toward becoming self-supporting as can reasonably be expected, the Parties' respective standards of living will be unconscionably disparate."

As to each of the FL 11-106(b) factors, the court found as follows:

(1) The ability of the party seeking alimony to be wholly or partly self-supporting:

Wife attended medical school in Peru. She practiced medicine in Peru for one year. The Parties came to the United States in 1977. Wife never practiced medicine in the United States and never sat for her medical board exams. The Parties agreed that Wife would help in Husband's medical practice rather than pursue a medical career. She explained that she did not pursue a medical career initially for financial reasons and later for family reasons.

Initially, Wife was the only person in the office. She cleaned examination rooms and instruments and did all the back-office work. Until their children were in high school, Wife worked from 9:00 AM to 3:00 PM. After the children were in high school Wife worked fulltime in Husband's practice. By then, she was responsible for all the billing and dealing with insurance companies. She also assisted with minor procedures. Wife sterilized the instruments, cleaned the room, and handled specimens.

25

On February 7, 2018, Husband terminated Wife's employment. Shortly thereafter, he re-hired her, and she continued to work for him until January 31, 2019[.] Husband again terminated Wife's employment following her deposition in this action.

Wife is now retired and does not intend to return to work. She plans to collect her Social Security benefits which will be $2,650 monthly.[] She will receive nearly $1 Million from the sales of the Marital Home and the Virginia Condo. Wife also has more than $500,000 in assets titled in her name.

(2) The time necessary for the party seeking alimony to gain sufficient education or training

to enable that party to find suitable employment:

Wife is 70 years old and retired. The Court finds that it is unreasonable to expect Wife can gain sufficient education or training to enable her to find suitable employment.

(3) The standard of living that the parties established during their marriage:

The Parties enjoyed a very high standard of living during their marriage. They resided in a large home, situated on two (2) acres in Potomac, valued at $1,873,000. The home has 5 bedrooms, 5 full bathrooms and 2 half-bathrooms, and an in-ground swimming pool.

During most of their marriage, the Parties enjoyed live-in domestic assistance. In more recent years, the Parties continued to have domestic assistance for 3½ days weekly.[] Their housekeeper's responsibilities included cleaning the home, doing the laundry, and cooking all the family's meals.

The Parties each drove luxury vehicles – Wife a Mercedes and Husband a Porsche. The family travelled extensively, sometimes for multiple weeks at a time, to locations including Australia, New Zealand, Asia, Mexico, and throughout Europe, including Spain and Italy, where they frequented luxury hotels and participated in organized tours. The family also traveled regularly – typically twice annually – to the Parties' home country, Peru. Christmas holidays and birthdays were extravagant celebrations, which included expensive gifts.

Both parties have enjoyed expensive skin treatments, Wife receiving Botox and fillers, Husband receiving a platelet rich plasma. Wife purchased

high-end creams and perfumes. Both Parties purchased expensive clothing and shoes at stores including Ferragamo, Bloomingdales, Neiman Marcus, and Nordstrom.

The Parties' children attended expensive private schools[.] Both attended private universities, and [their daughter] attended law school. The children's education costs were paid for with cash.

Husband repeatedly characterizes Wife's spending as "profligate," "out of control," "outrageous," "uncontrollable," and "beyond their means." While it cannot be seriously disputed that Wife spent large amounts on luxury items, her spending certainly was not beyond the Parties' means. Her spending was entirely consistent with the lifestyle that the Parties chose to live. Moreover, as discussed previously, for many years Husband engaged in substantial discretionary spending, *i.e.*, supporting his extramarital and adulterous affairs.

(4) The duration of the marriage:

The Parties had been married for approximately 43 years at the time of trial.

(5) The contributions, monetary and nonmonetary, of each party to the well-being of the family:

The parties had a traditional marriage, with Husband being the breadwinner and Wife running the home with a maid's assistance. Husband worked very hard and for long hours, as much as 120 hours weekly, to build and grow his medical practice. His medical practice has been very successful. Of course, due to his work's demands, Husband was often absent from the family. His nonmonetary contributions to the family were very limited. He says that he did the best he could with his limited time. He looks back on this with sadness because the children grow up quickly. The high cost of the Parties' chosen standard of living . . . was both monetary and nonmonetary.

Wife's contributions were largely, although not entirely, nonmonetary. She was the children's sole caretaker until they hired a live-in housekeeper or nanny when [their daughter] was 8 or 9 years old. Wife was responsible for parenting the Parties' children. According to [their daughter], Wife did everything for school for the children and was a parent in the true definition of the word. Wife drove the children to and from school. She volunteered at preschool, elementary school, and high school. Wife took

27

[their daughter] to her ballet events, school plays, and basketball, softball, and tennis practices and games.  Wife took [their son] to his music events and soccer practices and games.  Wife was responsible for all the back-to-school nights.  As Wife testified, she was primarily responsible for caring for the children and Husband's role was to provide money.

The Parties' children are now 44-years old and 38-years old.  The now adult children have been emancipated for more than 20 years, and so Wife is no longer required to care for the children or fulfill any of the responsibilities required for minor children.  There was no evidence that Wife has made any nonmonetary contributions to the family's well-being during the last 20 years other than with respect to Husband's medical practice.

For many years, Wife worked in Husband's medical practice.  Wife's employment in Husband's medical practice began when the children were in school.  Initially, she was the only employee in the practice and was paid $1,899 monthly.  She cleaned examination rooms and instruments and did all the back-office work.  Until their children were in high school, Wife worked from 9:00 AM to 3:00 PM.  After the children were in high school, Wife worked fulltime in Husband's practice.  By then, she was responsible for all the billing and dealing with insurance companies.  She also assisted with minor procedures.  Wife sterilized the instruments, cleaned the room, and handled specimens.

In or around 2010 or 2011, Husband hired a medical assistant, which reduced Wife's responsibilities.  Wife would cover for the medical assistant when he or she was out of the office.  At times, she worked from home doing billing and other clerical tasks.

About 10 years ago, Wife told Husband that she would not continue working in his practice unless he increased her compensation to $30 hourly.  Husband increased her compensation from $1,899 monthly, or $22,788 annually, to more than $62,000 annually, an approximately 122% increase.

Wife's medical background helped Husband's practice.  She proofread and corrected his dictation.  She communicated with other physicians.  Because of her familiarity with medical instruments, Wife was able to assist Husband with his procedures.

Wife contributed to [the] practice's growth.  She maintained the home, entertained referring doctors, and worked in the office.  She planned events and social engagements.  Their friends were physicians.  They hosted events . . . every two months.  After they began living in the Potomac home,

they held big events annually. At these larger events, they would host nearly 100 guests. She did everything for these events. At times[,] they hosted seated dinners. She was responsible for printing invitations, renting tables and tablecloths, among other details. The primary purpose of these events was to develop relationships with doctors who would refer patients to Husband.

Until about three years ago, Wife handled Christmas gifts. She prepared the budget, wrapped gifts, and delivered baskets. After they began using an outside vendor to handle the Christmas gifts, Wife was responsible for working with the vendor to complete this task.

(6) The circumstances that contributed to the estrangement of the parties:

Husband's extramarital affairs have been discussed at length. The Court finds that Husband's extramarital and adulterous relationships caused the Parties' estrangement. To the extent that Wife's "outrageous spending," as Husband characterizes it, contributed at all to the Parties' estrangement, it was minor by any reasonable comparison.

(7) The age of each party:

At the time of trial, Wife was 70 years old, and Husband was 71 years old.

(8) The physical and mental condition of each party:

Wife claims to suffer from neck pain and sciatica, which prevent her from cleaning her home. No medical evidence supporting her claim was presented. Wife takes no prescription medications for these conditions. She sees a massage therapist every three or four weeks. Wife recognizes that she could receive physical therapy, at least a portion of which would be paid by insurance, in place of her massages. She also has eczema for which she takes over the counter medications. She takes prescription medication to treat her high cholesterol. Wife has been seeing a therapist since 2017. Her therapist does not accept health insurance. Wife takes psychiatric medications as part of her mental health treatment.

Husband claims to be in good physical and mental health, albeit with some unspecified limitations.

(9) The ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

According to her February 21, 2020 Financial Statement, Wife's total monthly expenses and income were $17,390.81 and $2,776.17, respectively, leaving her with a $16,615 (rounded) monthly deficit.[]  The Court finds that Wife's monthly expenses are in certain respects excessive.  Recognizing the Parties' respective standards of living and stations in life, the Court finds the following expenses of Wife reasonable:

(1) **Primary residence:** $6,155, consisting of $5,000 for rent, $210 for telephone / cable /internet, $145 for cell phone, and $800 for housekeeping or maid service.

(2) **Other household necessities:** $1,000 for food, including drug store and household supplies.

(3) **Medical / Dental:** $1,571.81.  Based upon Wife's testimony that she will no longer undergo plastic surgery but that she receives $1,800 Botox and fillers procedures every 4 – 6 months, the Court has reduced Wife's $995 monthly Botox claim to $300 monthly (($1,800 x 2) ÷ 12 = $300)).

(4) **Recreation and entertainment:** $1,755.

(5) **Transportation:** $500.  Wife testified that she anticipates a reduction in her $1,459 transportation expense claim since she plans to live in Bethesda and everything that she needs will be within walking distance. She would need a car only to visit her daughter, who [lives and works within the county].

(6) **Gifts:** $920.

(7) **Clothing:** $1,500.

(8) **Incidentals:** $226.

(9) **Miscellaneous / Other:** $1,976.

Wife's total monthly expenses, as adjusted, are $15,623.81.  Wife's net monthly income, exclusive of any potential required minimum distributions, is $1,934.50.  Wife has a $13,689 (rounded) monthly deficit.

As discussed above, according to Husband's Financial Statement, his claimed total monthly expenses and income were $11,186.89 and $16,012.26, respectively, leaving him with a $4,825.57 monthly surplus.[] The Court finds that Husband's monthly expenses are in certain respects excessive. Recognizing the Parties' respective standards of living and stations in life, the Court finds the following expenses of Husband reasonable:

**(1) Primary residence:** $5,250, consisting of $5,000 for rent and $250 for telephone / cable / internet. Husband will no longer have the expenses associated with the marital home and the Tern Drive Property, since the Court will order that both properties be sold. Allowing $5,000 for rent equalizes the Parties' respective rent obligations after these two properties are sold.

**(2) Other household necessities:** $450 for food, including drug store and household supplies.

**(3) Medical / Dental:** $245.

**(4) Recreation and entertainment:** $917.

**(5) Transportation:** $430.

**(6) Gifts:** $250.

**(7) Clothing:** $400.

**(8) Incidentals:** $36.

**(9) Miscellaneous / Other:** $50.

Husband's total monthly expenses, as adjusted, are $8,028.

Each party relies upon their respect[ive] expert for the computations of Husband's income. Husband asserts that his net income, exclusive of any potential required minimum distributions, is $250,000 annually, or $20,833 (rounded) monthly. . . . Wife asserts that Husband's net income, exclusive of any potential required minimum distributions, is $312,326 (rounded) annually, or $26,027 (rounded) monthly. . . . The difference in the experts' gross income calculations is $84,016.

31

The Court has carefully considered each expert's testimony and each expert's "Expected Income" spreadsheet.[] The Court finds Mr. Estabrook's opinion more persuasive. The Court finds that Husband's net monthly income is $26,027. Husband has a $17,999 monthly surplus.

\* \* \*

Both Parties have chosen a comparatively luxurious lifestyle replete with substantial discretionary spending. However, "needs" is a relative term. Clearly, Husband has the present ability to meet his own "needs" while also meeting Wife's "needs."

(10) Any agreement between the parties:

There is no evidence of any agreement between the Parties regarding Wife's alimony claim.

(11) The financial needs and financial resources of each party:

This factor was largely addressed [above]. The Parties jointly own marital assets totaling more than $2.5 Million. Additionally, more than $3.1 Million of marital assets are titled in Husband's name and more than $500,000 in marital assets are titled in Wife's name. Wife also has $132,245 in nonmarital assets.

(12) Spouse in related institution:

This factor is inapplicable in this action.

After considering these factors, the court concluded as follows:

The Court has considered all the factors set out in MD. CODE, FAMILY LAW § 11-106(b). Of those factors, the Court finds most significant in this action the following: (1) the marriage's duration, (2) each Party's monetary and nonmonetary contributions to the family's well-being, (3) each Party's age, and (4) each Party's financial needs and resources.

The Parties had been married for approximately 43 years. Their agreement was that Husband would practice medicine and support the family financially, while Wife would raise the children. Both Parties carried out their agreed responsibilities. Implicit, if not explicit, in the Parties' agreement was that Wife would not use her medical education to practice

medicine. At her age, Wife cannot be expected to begin practicing medicine. As a result, she lacks the earning power that Husband possesses.

Significant in the Court's alimony determination is Wife's financial needs. In considering the Parties' financial needs and resources, the Court necessarily also considers all income and assets, the Court's monetary award to Wife, the nature and amount of each Party's financial obligations, and each Party's right to receive retirement benefits.

The Court finds that Wife's expenses greatly exceed her financial needs. The Court finds that Wife's needs for her primary residence, including rent, telephone / cable / internet, cell phone, and housekeeping or maid service, and household necessities, including food, drug store, and household supplies, total $7,155. The Court shall award Wife indefinite alimony in the amount of $7,155 monthly.

We disagree with Husband's contention that the court awarded Wife enough money to provide her with a better standard of living than she had during the marriage. We "accord great deference to the findings and judgments of trial judges, sitting in their equitable capacity, when conducting divorce proceedings." Tracey, 328 Md. at 385. The record supports the court's thorough findings as to the alimony factors outlined above.

Husband argues that the court erred because Wife "was awarded 50%[4] of the value of [Husband's] retirement accounts but the Court failed to include the Required Minimum Distribution (RMD) in its calculation of [Wife's] income." We disagree. In making its alimony determination, the court stated: "In considering the Parties' financial needs and resources, the Court necessarily also considers all income and assets, the Court's monetary award to Wife, the nature and amount of each Party's financial obligations, and each Party's right to receive retirement benefits." Despite Husband's argument, the court's

---

[4] As requested by the parties, the court awarded $644,365 to Wife from Husband's profit-sharing plan to equalize their retirement assets.

33

ruling plainly states that it considered "all income and assets" in making its alimony determination.

In sum, the court engaged in an exemplary consideration of each of the factors set forth in FL § 11-106(b) and determined that Wife was entitled to indefinite alimony (under FL § 11-106(c)) in the amount of $7,155 monthly. Given the court's extensive findings as to the standard of living that the parties established during the course of their marriage and Wife's reasonable expenses, we are not persuaded that the court erred in awarding this amount of indefinite alimony to Wife.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**